UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 18-280 (MJD/SER)

===================================================================

UNITED STATES OF AMERICA,

Plaintiff,                                      **DEFENDANT'S POSITION ON SENTENCING**

vs.

JANET ELIZABETH LOCKWOOD,

Defendant.

===================================================================

# INTRODUCTION

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 128 S. Ct. 586, 598 (2007), quoting Koon v. United States, 518 U.S. 81, 113 (1996).

Janet Lockwood pled guilty to Conspiracy to Distribute 500 grams or more of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(a) and 846, as charged in Counts 1 of the Indictment.

Currently, there is a dispute as to the drug purity and the resulting adjusted offense level. To date, the parties have not received any lab reports concerning the purity of the methamphetamine. Therefore, the defense agrees with the PSR calculation of a base offense level of 32. That level may have to be adjusted if the lab reports support the government's position with respect to purity.

Additionally, it appears that Ms. Lockwood is safety valve eligible, rendering the 10-year mandatory minimum inapplicable.

Ms. Lockwood respectfully moves the Court for a downward variance based on the considerations of the factors set forth in 18 U.S.C. § 3553(a).

## THE BACKGROUND OF JANET LOCKWOOD

Janet Lockwood was born in Tucson, Arizona in 1959. She is the youngest of three children. Her parents divorced in 1971, when Janet was age 12. They have both since passed, in 1996 and 2013.

The early years of her childhood were spent in Tucson, and described by Lockwood as "wonderful". PSR ¶38. Though she wasn't extremely close to her two older brothers, fond memories playing with neighbors, friends, and extended family fill her mind.

Everything changed in the summer of 1970. Janet suffered severe third

degree burns from a fire. Back in a time and place where people burned their garbage, Janet was playing with a friend near the rubbish fire. They tossed a hairspray can into the fire. The hairspray can exploded, and Janet suffered third degree burns on her ears, face and chest. She was hospitalized for weeks, received upwards of 400 stitches, and underwent multiple, extremely painful skin grafting procedures. The physical scars remain with her to this day.

    Unfortunately, the scars do not stop at the surface of her skin. They go much deeper, to her heart and mind. Ms. Lockwood recalls a shift in her family dynamic after the injury. While she was not particularly close to her brothers prior to the accident, they began to resent her after the accident due to the attention her medical condition demanded.   Her father worked long hours and struggled with alcoholism, which thrived in her immediate and extended family.  Her mother stayed home to tend to her medical needs. PSR ¶38. Her cousin, Roger Lockwood, corroborates much of Ms. Lockwood's recitation. PSR ¶¶45-46.

    Once Janet recovered enough to return back to school, she was victim to not only the scars and pain of the burns, but the torment and teasing from fellow peers. Children can be cruel to one another, and a young adolescent with horrific scars is an easy target. The memories of the years of ridicule hurts Janet to this day.

    Her mother and father decided to separate in 1971, and Janet moved to Michigan with her mother, while her father and brothers remained in Tucson. Her

relationship with her brothers grew even more and more strained, as they believed Janet was to blame for their parents' separation. Janet returned to Tucson when she was 15, and remained in or around the area until she turned 29. PSR ¶39. Janet dropped out of school during the eleventh grade. She does not have a diploma or G.E.D. PSR ¶64.

With age, both of Janet's parents developed medical issues. Janet became a caregiver for each of her parents, undoubtedly because of love, but perhaps also because of a desire to repay them for caring and providing for her after her traumatic accident. She nursed her mother until lung cancer killed her. She also nursed her father until old age and dementia took him away.

Just as the accident was a watershed moment in Janet's life, so too it appears that her mother's death was another one. Janet turned to chemicals, probably to run from or dull the emotional pain she felt. This is not offered as an excuse, but rather for a likely explanation of what led to her decision to turn to chemicals. After her mother's death in 1996, Janet was hospitalized for attempting to overdose on Xanax. PSR ¶40. Shortly after that, in 1998, Janet began using crack cocaine. The crack only took 18 months to ruin her life. During that time, at age 39, Janet gave birth to her only child, William Joseph Lockwood Cota. Janet continues to be haunted by what transpired. Her son was born with cocaine in his system. Child protective services took him and put him into foster care. He died at two months of

age. The official cause was listed as S.I.D.S., although he was treated for E. Coli a couple days before his death. PSR ¶41. Janet's relationship with William's father did not last after their son's death.

Alienated from her family members and most of her friends, much of Janet's adult life has been a lonely one. Some of it was by choice: Janet knew she needed to disassociate from many of her "friends" as she wanted to get away from the drug and criminal lifestyle. Other relationships were destructive due to many instances of domestic abuse, some quite serious. PSR ¶56. Ms. Lockwood is frankly afraid to talk about some of the experiences she had, both in circles of "friends" as well as prior relationships. They were indeed traumatic, some of the worst her counsel has heard of. She is lucky to be alive.

On top of it all, Ms. Lockwood has to deal with physical disability, PTSD, and depression. PSR ¶¶ 49, 52, 57 and 58.

Despite facing a significant prison sentence, Ms. Lockwood is getting on the right track. She currently attends AA/NA, goes to church, and recently started working. She hopes to return to the

## ARGUMENT

In determining a defendant's sentence, a court must first determine the appropriate sentencing guidelines range. *Gall v. United States*, 128 S. Ct. 586, 596

(2007) (citing *Rita v. United States,* 127 S.Ct. 2456, 2456 (2007)).  After the Court determines the guideline range, it considers all of the factors set forth in 18 U.S.C. § 3553(a).  In determining the just sentence, the district court is prohibited from presuming that the Guidelines range is reasonable. *Id*. Instead, it must "make an individualized assessment based on the facts presented." *Id*.  The sentencing court may not require extraordinary circumstances to justify a sentence outside the guideline range.

### A. Ms. Lockwood's Personal History and Characteristics Support a Downward Variance.

"[D]istrict courts are not only permitted, but required, to consider 'the history and characteristics of the defendant.'" *United States v. Chase*, 560 F.3d 828, 830 (8th Cir. 2009) (citing *United States v. White,* 506 F.3d 635, 644 (8th Cir. 2007)).  "'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 128 S.Ct. at 598 (quoting *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035 (1996)).  Ms. Lockwood's personal history and characteristics support a downward variance.

On the one hand, many people endure tragic and traumatic circumstances without deciding to transport methamphetamine across the country. Some are

better equipped than others at making the right choices in the face of adverse circumstances. Sometimes the way a person is raised and the examples they are shown in the face of adversity can critically impact what type of behavior is modeled in later adult life. Children of alcoholics may see running from fear or pain as a solution. Psychological therapy, or a lack thereof, can also affect the way a person responds to adversity and trauma.

    Ms. Lockwood has endured significant physical and emotional trauma.

- An alcoholic father that was not home much;
- Estrangement from her brothers at an early age;
- Third degree burns at age 11 with lifelong scarring and painful medical procedures;
- Torment from peers due to observable scarring;
- Drug abuse and addiction;
- Losing her only child to CPS followed by his quick death;
- A nomadic and lonely lifestyle;
- Physical disability;
- Depression and PTSD; and
- Domestic abuse and other unmentionable occurrences.

These are Janet's personal history and characteristics.

Lately, Ms. Lockwood has shown signs that she may be able to rehabilitate. Admittedly, she has struggled some at the halfway house. Structure has not been a part of her life for decades. But she has found her way to AA and NA. She attends church. She enjoys cooking for her peers in the halfway house. She has even started working. She wants an education and to start over. She has hope.

Some courts have recognized that a defendant facing a prison sentence for the first time may receive a variance because a first time prison sentence is a sufficient deterrent: U.S. v. Cull, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, where advisory range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending); U.S. v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration); U.S. v. Baker, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence of 78 months from 108 months for defendant convicted of distributing child porn, justified in part by court's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with goal of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B).

## POST SENTENCING REHABILITATION

The longstanding mitigating considerations of rehabilitation in general, and pre-sentence rehabilitation in particular, have received a recent declaration of support from various courts.

Following earlier disagreements within and among Circuits, pre-sentence rehabilitation emerged as a widely-accepted basis for below guideline sentences.[1] Post-offense rehabilitation has become a widely-accepted basis to impose a sentence below the advisory guidelines, both through a downward departure under § 5K2.0, and as a variance from the guidelines under 18 § 3553(a), supporting sentencing reductions considerably greater than the one sought here.[2] Reductions of many years have been affirmed in light of a defendant's rehabilitation.[3]

A district court judge from Nebraska explained the role that a defendant's post- offense conduct can play in supporting a variance, and the way such conduct impacts several factors in a district court's sentencing analysis:

---

[1] *See, e.g.*, *United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008); *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008); *United States v. Chapman*, 356 F.3d 843, 849 (8th Cir. 2004); *United States v. Sanchez-Gonzalez*, 347 Fed.Appx. 852, 855 (3d Cir. 2009); *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008); *United States v. Brock*, 108 F.3d 31 (4th Cir. 1997); *United States v. Core*, 125 F.3d 74, 75 (2d Cir. 1997).

[2] *See e.g.*, *United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008) (affirming a sentence of probation for a drug offender with a guideline range of 36-46 months, based in part on post- offense rehabilitation).

[3] *See e.g.*, *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008) (affirming a sentence of probation in the face of a guideline range of 97-121 months in part based on post-offense rehabilitation).

> When a defendant has demonstrated extraordinary success at rehabilitation efforts, the need for incarceration is diminished. The history and characteristics of the defendant are changed. The punishment that is "just" is changed. The need for specific deterrence is lessened. The need for correctional programs such as psychological counseling and drug rehabilitation may be negated. The defendant's isolation and incapacitation are no longer paramount for the protection of society.[4]

Indeed, the Eighth Circuit has remanded for resentencing when a district court erroneously refused to consider the post-offense rehabilitation of a defendant who went to trial and did not accept responsibility for his offense, holding that "atypical post-offense rehabilitation can itself be the basis for a departure under § 5K2.0."[5]

The Supreme Court reemphasized the significance of rehabilitation to sentencing in *Pepper v. United States*, 131 S.Ct. 1229 (2011). In *Pepper*, the Court resolved a split among the circuits in defendants' favor, reversing the Eighth Circuit and holding that post-sentence rehabilitation can support a below-guideline sentence.[6] In so doing, the Court made it clear that all rehabilitation is relevant. In sum, governing precedent abundantly supports below-guideline sentences in cases where the accused demonstrates post-offense rehabilitation.

Janet Lockwood's progress toward rehabilitation is reflected in several ways throughout the PSR. She has kept her mental health appointment(s). Although it was a close call, she has remained in the halfway house while on pretrial supervision. She attends recovery groups and church. She is working. All of her random drug tests have been negative.

She quickly took responsibility for her part in the crime.

---

[4] *United States v. Hasan*, 2009 WL 1813650, *2 (D. Neb. June 24, 2009); *see, also, Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 1240-43 (2011) (noting that "the punishment should fit the offender and not merely the crime," and describing the role that post-sentencing rehabilitation plays in determining a fair sentence).
[5] *United States v. Chapman*, 356 F.3d 843, 847-49 (8th Cir. 2004).
[6] *Pepper*, 131 S.Ct. at 1241

This poses an important sentencing question - what would happen if Ms. Lockwood were given a sentence that elevated rehabilitation over retribution? - for which an answer is often not available. It appears that Ms. Lockwood has moved in a consistently positive direction in the time since her arrest. Viewed together, her accomplishments reflect both considerable effort and demonstrable success.

### B. Deterrence Versus Rehabilitation and a Sentence Sufficient But Not Greater Than Necessary.

The government will discuss the need for deterrence and seriousness of the crime. But rehabilitation is also a goal of punishment. 18 U.S.C. § 3553 (a)(2)(D). As one district court judge opined: "[t]hat goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind….A judge should be hesitant before sentencing so severely that [he or she] destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than necessary to satisfy the goals of punishment."[1]

Courts have recognized that prison has greater significance for those imprisoned for the first time. See U.S. v. Baker, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence of 78 months from 108 months for defendant convicted of distributing child porn, justified in part by judge's finding that prison

---

[1] *U.S. v. Carvajal*, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005) (unpublished, attached hereto).

would mean more to this defendant than one who has been imprisoned before, which resonated with goal of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B).

## CONCLUSION

Ms. Lockwood is 59 years old. Her criminal history is relatively minor. She has personal struggles to deal with, but she also has potential to live out her remaining years in a positive fashion.

Based on the factors set forth in 18 U.S.C. §3553(a), Ms. Lockwood asks the Court to grant a downward variance.

Respectfully submitted,

RYAN PACYGA CRIMINAL DEFENSE

Dated: April 23, 2019     By:   /s/ Ryan M. Pacyga
Ryan M. Pacyga (#321576)
333 South 7th Street, Suite 2850
Minneapolis, MN 55402
*Attorney for Defendant*